# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON, et al., | Civil Action No. 19-17231 (JMV) |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| THE NORTH RIVER INSURANCE COMPANY, et al., | |
| Defendants. | |

**CLARK, Magistrate Judge**

     **THIS MATTER** comes before the Court on a motion by Plaintiffs Certain Underwriters at Lloyd's, London ("Lloyd's"), Tenecom Limited, Winterthur Swiss Insurance Company, Sompo Holdings, Inc., Allianz Suisse Versicherungs-Gesellschaft ("Allianz") and Delta Lloyd Schadeverzekering NV ("Delta Lloyd") (collectively "Plaintiffs" or the "Reinsurers") to compel Defendants The North River Insurance Company and United States Fire Insurance Company ("US Fire") (collectively "North River" or "Defendants") to provide certain discovery. *See* Dkt. No. 191.[1] North River opposes Plaintiffs' motion. *See* Dkt. No. 192. For the reasons set forth below, Plaintiffs' motion [Dkt. No. 191] is **GRANTED in part and DENIED in part without prejudice**.[2]

---

[1] At the Court's direction, Plaintiffs filed an amended brief in support of their motion providing citations for previously unattributed quotations. *See* Dkt. No. 222.
[2] Plaintiffs' motion to compel is DENIED without prejudice as to Categories A and B and GRANTED in part as to Category C.

## I.    BACKGROUND

This matter is a reinsurance contract dispute arising from certain reinsurance agreements entered into by the parties pursuant to which, under certain circumstances and subject to certain terms and conditions, Plaintiffs agreed to indemnify Defendants for loss payments made under insurance policies issued to Mine Safety Appliances Company ("MSA").

### A. The Reinsurance Contracts

The reinsurance agreements at issue in this matter were issued as part of "a specialized insurance and reinsurance program" known as the "Joint Underwriting Program" (the "JU Program"). Dkt. No. 224, Fourth Amended Complaint ("FAC") at ¶ 23. According to Plaintiffs, the "JU Program was a 'fronting' program under which umbrella and excess insurance coverage was issued to US-based policyholders by a US-based insurer within The Crum & Forster Insurance Companies family, but largely reinsured by London-based reinsurers who retained complete underwriting and claims authority . . . ." *Id.* at ¶ 24.

According to Plaintiffs, there were eleven North River policies issued to MSA under the JU Program between August of 1972 and April of 1985, totaling over $200 million in annual limits, and one US Fire policy (collectively the "MSA Policies").[3] *Id.* at ¶ 30. Under the JU Program, the policies issued to MSA were each the subject of facultative reinsurance agreements reinsured by London-based insurers. *Id.* at ¶ 33. Plaintiffs claim that Defendants "entered into facultative reinsurance agreements with various reinsurers, including [Plaintiffs], reinsuring a specified amount of the policies issued to MSA" (collectively the "Reinsurance Contracts").[4] *Id.* at ¶ 34. According to Plaintiffs, the participation of each respective reinsurer "varied from year to year"

---

[3] The US Fire policy issued to MSA was effective from August 1, 1972 to April 1, 1976. FAC at ¶ 30.
[4] Plaintiffs claim the "Reinsurance Contracts were entered into by the parties in the United Kingdom, where the Reinsurers subscribed to the . . . Reinsurance Contracts by signing onto the slips in London, United Kingdom." FAC at ¶ 43.

and each reinsurer is "responsible only for their individual respective share of covered loss for their own part and not for any share on account of another reinsurer," and not every reinsurer participated on every Reinsurance Contract. *Id.* at ¶ 35.

Plaintiffs' claims in this matter differentiate between "Lower Layer JU Policies" and "Higher Layer JU Policies" (collectively the "JU Policies"). *Id.* at ¶ 39-42. Plaintiffs identify seven "Lower Layer JU Policies," each of which "attach excess of $5 [m]illion dollars, excess of underlying primary coverage" and provide a total of $82.75 million limits.[5] *Id.* at ¶ 40-41. The remaining five policies at issue in this matter, the "Higher Layer JU Policies," "sit at least excess of $20 million with [two] sitting excess of $50 million."[6] Dkt. No. 222 at p. 3.

Plaintiffs assert that the terms of the Reinsurance Contract "did not provide that North River would have claims control," but rather "gave the [R]einsurers sole control of the settlement, negotiation, and adjustment of all claims tendered to the MSA Policies, including the appointment of legal counsel to defend any coverage action." FAC at ¶ 44.

**B. Underlying MSA Litigation**

According to Plaintiffs, "MSA is an entity that manufactures and sells products for the protection of the health and safety of individuals in certain work environments, including air purifying respirators, protective body gear, and clothing." FAC at ¶ 66. Plaintiffs claim that "MSA became the subject of numerous lawsuits wherein claimants alleged that they became ill as a result of inhaling coal dust, asbestos and silica through allegedly defective MSA respirators or as a result of exposure to MSA's asbestos-containing products . . . ." *Id.* at ¶ 67.

---

[5] The Lower Layer JU Policies are identified by Plaintiffs as JU00139, JU00653, JU00830, JU00988, JU01123, JU01225 and JU01319 (collectively the "Lower Layer JU Policies"). FAC at ¶ 39.
[6] The Court notes that the FAC identifies four Higher Layer JU Policies: JU00157, JU00171, JU00010, and JU00158 (collectively the "Higher Layer JU Policies"). FAC at ¶ 42. However, Plaintiffs' brief in support of its present motion to compel designates a fifth Higher Layer JU Policy: XS 2526 (the "US Fire Policy"). Dkt. No. 222 at p. 3, n. 2.

MSA, Plaintiffs assert, "first tendered these claims to its primary and umbrella insurers," and then, "[u]pon exhaustion of its primary and umbrella insurance," tendered the claims to its "first level excess insurers." *Id.* at ¶ 69-70. Then, beginning in 2006, MSA allegedly notified North River that the umbrella insurance policies underlying three of the Lower Layer JU Policies were "exhausted or nearly exhausted," and in or about September 2007, MSA began tendering claims to those policies and to a fourth Lower Layer JU Policy. *Id.* at ¶ 71-72. According to Plaintiffs, at that time, North River's exposure under those policies had increased since their issuance, from North River retaining 20% or less of the net risk to North River retaining approximately 60-80% of the net risk. *Id.* at ¶ 73-77.

Thereafter, MSA and North River became involved in numerous lawsuits concerning the scope of coverage for the claims against MSA under the insurance policies issued to MSA by North River, including, as relevant to this matter: (1) *Mine Safety Appliances Company v. The North River Insurance Company*, Civil Action No. 09-00348, in the United States District Court for the Western District of Pennsylvania (the "PA Federal Action"); (2) *Mine Safety Appliances Company v. The North River Insurance Company*, GD 10-7432, in the Court of Common Pleas of Allegheny County, Pennsylvania (the "PA State Court Action"); and (3) *Mine Safety Appliances Company v. AIU Insurance Company, et al.,* Civil Action No. N10C-07-241, in the Superior Court of the State of Delaware (the "Delaware Action") (collectively the "Coverage Actions"). *Id.* at ¶ 78.

### i. The PA Federal Action

In the PA Federal Action, which was filed in March 2009, MSA alleged that North River had breached its obligations under one of the Lower Layer JU Policies, JU01225, by "failing to respond" to the claims MSA had tendered to that policy. *Id.* at ¶ 79-80. According to Plaintiffs,

because North River's net exposure had increased under the relevant policy since its issuance, "North River requested that [Plaintiffs] transfer claims control to North River, despite [Plaintiffs] having claims control" under the applicable reinsurance contract. *Id.* at ¶ 82. Plaintiffs allegedly agreed that North River could "take the lead" in defending the PA Federal Action, subject to Plaintiffs' "retaining the ability to veto North River's coverage decisions and strategy and exercise their claims control rights." *Id.* at ¶ 83. During the pendency of the PA Federal Action, the parties were ordered to participate in a mediation. *Id.* at ¶ 133. The parties' mediation did not result in a settlement. *Id.* at ¶ 135.

### ii. The PA State Court Action

The PA State Court Action, which was filed in April 2010, involved claims that MSA had "tendered to and sought coverage from" three Lower Layer JU Polices: JU00830, JU00988 and JU01123. *Id.* at ¶ 85. According to Plaintiffs, in the PA State Court Action, North River claimed that MSA had "avoided tendering any claims to the policy periods involving insolvent insurers" and "sought a declaration . . . that it did not have any obligations to MSA" under the subject policies for the claims that had been tendered. *Id.* at ¶¶ 85, 87. Additionally, North River contended that "MSA had not exhausted the underlying retentions" of the subject policies and that the policies did not cover the claims against MSA. *Id.* at ¶ 89. MSA asserted counterclaims alleging that North River had breached the underlying insurance contracts "by not paying for the defense and settlement of the claims" MSA had tendered to the subject North River policies and by "failing to act in good faith and deal fairly with MSA." *Id.* at ¶ 90.

Plaintiffs claim that "[l]ater in 2010," North River requested that Plaintiffs give North River control to defend against MSA's coverage claims under the subject policies and "give up their veto over coverage and strategy decisions." *Id.* at ¶ 95. According to Plaintiffs, with the

5

exception of Allianz, which was purportedly not notified and did not consent, Plaintiffs agreed to an "arrangement" under which North River assumed control over the defense of MSA's claims against the subject policies "with [all] parties reserving all rights." *Id.* at ¶ 97.

Plaintiffs assert that at the time North River requested claims control, North River "believed and represented to [Plaintiffs] that the main exposure it faced was under the Lower Layer JU Policies," and North River "did not believe that the main exposure it faced was under the Higher Layer JU Policies." *Id.* at ¶ 98. This belief was, according to Plaintiffs, partly due to the fact that the Higher Layer JU Policies "had much larger retentions" than the Lower Layer JU Policies and one of "North River's principle [sic] coverage defenses . . . was that MSA had not exhausted the underlying retentions" of each policy. *Id.*

The PA State Court Action was tried before a jury in 2016. *Id.* at ¶ 107. The jury found that North River had breached its contractual obligations under the three Lower Layer JU Policies at issue by failing to reimburse MSA for defense and settlement costs MSA had tendered to those policies. *Id.* at ¶ 108. Specifically, the jury awarded MSA $9,415,940.57 under JU00830, $1,183,606.14 under JU00988 and $309,511.15 under JU01123, and awarded $1 of damages against North River for MSA's bad faith claim (the "Jury Verdict"). *Id.* at ¶ 109-10.

In 2017, a bench trial was held in the PA State Court Action regarding MSA's counterclaims against North River asserting a violation of Pennsylvania's insurer bad faith law. *Id.* at ¶ 111. The court found that North River had acted in bad faith in connection with MSA's coverage claims and awarded MSA "nearly $47 million in bad faith damages," which was later increased to approximately $49 million (the "Bad Faith Award"). *Id.* at ¶ 112.

The Jury Verdict and the Bad Faith Award were later reduced to a final judgment in the PA State Court Action, and, according to Plaintiffs, that judgment was never "vacated, withdrawn,

or overturned on appeal" and is therefore binding against the three Lower Layer JU Policies at issue. *Id.* at ¶ 113-15. Thus, Plaintiffs contend, "North River is collaterally estopped from denying the legal effect of the [J]ury [V]erdict, Bad Faith Award, and judgment entered thereon with respect to its obligations" under the relevant policies. *Id.* at ¶ 116.

### iii. The Delaware Action

In June 2010, MSA filed the Delaware Action, in which MSA sought, in part, a "declaratory judgment concerning the obligation of various general liability policies," including the policies at issue in this matter, with respect to the claims against MSA. *Id.* at ¶ 92-93. According to Plaintiffs, North River moved to stay the Delaware Action pending disposition of the PA Federal Action and the PA State Court Action, and North River's motion to stay was granted in January of 2011. *Id.* at ¶ 94.

In October 2017, the court in the Delaware Action issued a ruling regarding the application of "non-cumulation" provisions present in the JU Policies and, according to Plaintiffs, ruled that the "non-cumulation clause [in the JU Policies] at issue . . . appl[y] only where payment to a single claimant is in excess of policy limits." *Id.* at ¶ 137. Plaintiffs claim the court's ruling in the Delaware Action was later reduced to a judgment and is binding with respect to the JU Policies. *Id.* at ¶ 139.

### C. North River's Allocation of Payments

### i. The 2017 Billings

Following the judgment entered against North River in the PA State Court Action, Plaintiffs allege that North River, "[c]ompelled by ongoing threats by MSA to seek additional extra-contractual damages, attorneys' fees and interest . . . elected to pay certain outstanding claims that MSA had previously tendered to [North River] as of 2017" and issued a payment to MSA of

approximately $80,000,000 in indemnity and $500,000 in defense costs. *Id.* at ¶ 117-18. Plaintiffs claim that the payment made to MSA by North River was not allocated to the applicable policies "consistent with the manner in which MSA had tendered them to the insurance policies or with the rulings and judgment in the [PA State Court Action]." *Id.* at ¶ 119. Specifically, Plaintiffs allege that despite the judgment entered in the PA State Court Action as to the three Lower Layer JU Policies at issue therein, North River did not allocate its payment to those policies.[7] *Id.* at ¶ 120. Thereafter, North River billed their reinsurers, including Plaintiffs, based upon their allegedly "unreasonable allocation" (the "2017 Billings"). *Id.* at ¶ 124.

Additionally, as to the 2017 Billings, Plaintiffs contend that North River used the non-cumulation provision present in some of the Lower Layer JU Policies to "justify the allocation of some of its loss settlement payments into to the Higher Layer JU Policies." *Id.* at ¶ 121. According to Plaintiffs, North River never raised the non-cumulation provision in any of its reservation of rights letters to MSA before 2017, never asserted the non-cumulation provisions in the PA State Court Action and never advised Plaintiffs of its contention that the non-cumulation provision applied to the MSA claims. *Id.* at ¶¶ 122-23, 125.

Despite their disagreement with North River's allocation, with the exception of Delta Lloyd and Allianz, Plaintiffs paid the amounts billed in the 2017 Billings "subject to a full reservation of rights including the right to recoup their payment [to North River] whilst they were seeking further information and explanation from North River." *Id.* at ¶ 130.

### ii. The MSA Settlement and 2018 Billings

Thereafter, following the court's ruling regarding the non-cumulation provision in the Delaware Action, North River and MSA reached a global settlement, which was memorialized in

---

[7] At issue in the PA State Court Action were JU00830, JU00988 and JU1123, all of which are Lower Layer JU Policies.

a confidential settlement agreement executed in July 2018 (the "MSA Settlement"). *Id.* at ¶¶ 143, 145. Under the MSA Settlement, North River agreed to pay a total of $156,000,000 to MSA, of which the parties agreed North River had already paid $81,268,726.10, leaving a balance of $74,731,273.90. *Id.* at ¶ 147. The MSA Settlement does not specify how the payment is to be allocated. *Id.* at ¶ 149.

Following the execution of the settlement agreement, in September 2018, North River billed Plaintiffs for additional amounts allegedly owed resulting from the MSA Settlement payment (the "2018 Billings"). *Id.* at ¶ 150. Plaintiffs claim that according to the billing report provided by North River, $37,000,000 of the MSA Settlement was allocated to the settlement of the Bad Faith Award. *Id.* at ¶ 151. Additionally, North River purportedly advised Plaintiffs that its "errors and omissions" insurance carriers (the "E&O Insurers") were funding the $37,000,000 settlement of the Bad Faith Award and that no amount of that portion of the settlement would be allocated to Plaintiffs. *Id.* at ¶ 152.

Of the remaining settlement amount, Defendants purportedly allocated $116,750,000 to their various policies using the following criteria: (a) the application of the non-cumulation clause in the North River policies on a "per-occurrence basis"; (b) treating the claims against MSA as arising out of two occurrences; and (c) MSA would "seek to optimize the allocation (as permitted by court rulings) to the North River policies to secure maximum recovery." *Id.* at ¶ 154. Plaintiffs claim that under North River's application of the foregoing criteria, Defendants have allocated a "substantial share" of the MSA Settlement to Higher Layer JU Policies. *Id.* at ¶ 155. This share, Plaintiffs contend, is "greater than should have been allocated . . . based upon the policy language, the law, and the rulings against North River" in the Coverage Actions. *Id.*

### D. Plaintiffs' Complaint

According to Plaintiffs, North River allocated the MSA Settlement "in a manner intended to increase [Defendants'] recovery" by allocating the MSA Settlement to Higher Layer JU Policies on which Defendants have more available reinsurance and avoiding allocating to Lower Layer JU Policies where North River has less available reinsurance. *Id.* at ¶ 157-58. In doing so, Plaintiffs allege, North River has allocated a substantial share of the MSA Settlement to Higher Layer JU Policies that are "not properly payable as loss under those policies." *Id.* at ¶ 159.

This allegedly improper allocation by North River forms the basis of Plaintiffs' claims in this action. According to Plaintiffs, North River's allocation conflicts with the various court decisions and judgments in the Coverage Actions as applied to the policies at issue in two primary ways. First, Plaintiffs argue that North River's failure to allocate any indemnity to the three Lower Layer JU Policies at issue in the PA State Court Action is "inconsistent" with the judgment entered therein against those specific policies. *Id.* at ¶ 166. Secondly, Plaintiffs contend that North River's application of the non-cumulation clause in the North River policies on a per-occurrence basis is inconsistent with the court's ruling the Delaware Action, which found that the non-cumulation clauses contained in certain JU Policies "did not apply on a per-occurrence basis." *Id.* at ¶ 161-62. According to Plaintiffs, a proper application of the non-cumulation ruling by the court in the Delaware Action would have eliminated the allocation of any indemnity to three of the Higher Layer JU Policies and would have substantially reduced the allocation to the fourth Higher Layer JU Policy and the US Fire Policy. *Id.* at ¶ 165.

Based upon North River's allegedly improper allocation, Plaintiffs assert claims against Defendants for breach of contract and breach of the implied covenant of good faith and fair dealing, and seek a declaratory judgment that Plaintiffs are not obligated under the Reinsurance Contracts

to pay the 2017 Billings or the 2018 Billings or to indemnify Defendants for losses occurring outside the applicable period of reinsurance.

Plaintiffs' initial Complaint in this matter was filed in the Superior Court of New Jersey, Morris County, Law Division on December 21, 2018. Dkt. No. 65-1. Plaintiffs filed a Second Amended Complaint on August 13, 2019, which added a claim against Banco de Seguros del Estado ("Banco"). Dkt. No. 1-1. Banco is a legal entity wholly owned by Uruguay and is therefore considered a "foreign state" under 28 U.S.C. § 1603. Dkt. No. 1, Notice of Removal at ¶ 12-13.

Banco accepted service of the Summons and Second Amended Complaint on August 13, 2019. *Id.* at ¶ 6. On August 27, 2019, Banco timely removed this matter to this Court pursuant to 28 U.S.C. § 1441(d), citing this Court's jurisdiction under 28 U.S.C. § 1330. Pursuant to a joint stipulation submitted by the parties, Banco was voluntarily dismissed from this action on July 29, 2020. *See* Dkt. No. 88. The Court, however, continues to exercise supplemental jurisdiction over the remaining claims. *Id.*

Following the dismissal of Banco, Plaintiffs filed their Fourth Amended Complaint [Dkt. No. 224][8] and Defendants filed their Answer and Second Amended Counterclaim [Dkt. No. 130]. Defendants' Second Amended Counterclaim (hereinafter "SAC") asserts claims against Plaintiffs for breach of contract based upon Plaintiffs' purported failure to pay certain outstanding billings and seeks a declaratory judgment regarding Plaintiffs' responsibilities under the Reinsurance Contracts.

---

[8] Plaintiffs filed their Fourth Amended Complaint under seal on June 8, 2021. *See* Dkt. No. 124. A motion to seal Plaintiffs' Fourth Amended Complaint was granted on August 11, 2021. *See* Dkt. No. 148. Plaintiffs, however, did not file an unredacted version of their Fourth Amended Complaint until directed to do so by the Court subsequent to the filing of the present motion. *See* Dkt. No. 216.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 26 governs the scope of discovery in federal litigation and provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Rule 26 is to be construed liberally in favor of disclosure, as relevance is a broader inquiry at the discovery stage than at the trial stage. *Tele–Radio Sys. Ltd. v. De Forest Elecs., Inc.,* 92 F.R.D. 371, 375 (D.N.J. 1981). While relevant information need not be admissible at trial in order to grant disclosure, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).  Upon a finding of good cause, a court may order discovery of any matter relevant to a party's claims, defenses or the subject matter involved in the action. "Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.,* 173 F.3d 188, 191 (3d Cir. 1999).

"[W]here a party receives evasive or incomplete answers to a discovery request, they are permitted to bring a motion to compel disclosure" under Federal Rule of Civil Procedure 37. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2006 U.S. Dist. LEXIS 34129, at *6 (E.D. Pa. May 26, 2006). "The party resisting disclosure bears the burden of persuasion." *Id.*

Pursuant to Rule (26)(b)(2)(C), courts are required to limit discovery where:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Similarly, pursuant to Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" In moving for a protective order, the "burden of persuasion [is] on the party seeking the protective order." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir. 1986). The party seeking a protective order "must show good cause by demonstrating a particular need for protection." *Id.* Establishing "good cause" requires the movant to "specifically demonstrate [ ] that disclosure will cause a clearly defined and serious injury. Broad allegations of harm, unsubstantiated by specific examples, however, will not suffice." *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir. 1995) (citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir. 1994)).

## III.   DISCUSSION

In the present motion, Plaintiffs seek to compel the disclosure of documents related to North River's payment and allocation of the MSA Settlement, including North River's pre-settlement analysis. North River objects to the production of the subject documents arguing that they are protected from disclosure by various privileges.

At the outset, the Court must address two separate but related disputes regarding the law to be applied in deciding Plaintiff's present motion. First, the Court must determine the standard of law to be applied in deciding the various issues of privilege implicated by Plaintiff's motion,

which include the attorney-client and work product privileges and Pennsylvania's mediation privilege. As to the parties' disputes regarding North River's assertion of the work product privilege, it is clear that "[u]nlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3)." *Coregis Ins. Co. v. L. Offs. of Carole F. Kafrissen, P.C.*, 57 F. App'x 58, 60 (3d Cir. 2003). It is less clear, however, which law is to be applied to North River's assertions of attorney-client privilege. The parties' initial briefs did not substantively address this issue and provide conflicting and unexplained assertions as to the governing law.[9]

In their initial brief, Plaintiffs stated only, in a footnote, that "the Reinsurance Contracts are governed by the law of England and Wales,"[10] but that "this Court need not wade into any complex choice of law analysis here, where this is no conflict concerning the basic principles of privilege and the result is the same regardless of the applicable law." Dkt. No. 222 at p. 12, n. 12. Plaintiffs did not explain the "basic principles of privilege" or make any assertion regarding the applicable law. Indeed, Plaintiffs cited to authority from various federal districts and circuits as well as authority from state courts in Pennsylvania and New York.

North River's initial brief contended that "this is a diversity case, so state law applies to questions of privilege." Dkt. No. 192 at p. 6.  However, North River then goes on to state that although it "expects the question of applicable law to be a contested one as this case proceeds, for purposes of attorney-client privilege and work product analysis, the principles at issue do not vary significantly among the potential jurisdictions."[11] *Id.* Curiously, although North River argues that

---

[9] Neither parties' briefs contain a statement of applicable law.

[10] Plaintiffs do not state the basis of their assertion that the Reinsurance Contracts are governed by the law of England and Wales or provide any supporting documentation or evidence.

[11] North River does not explicitly identify the various purported "potential jurisdictions" but cites to the Federal Rules of Evidence, various state rules and statutes from New Jersey, Illinois, New Hampshire, Pennsylvania and Delaware, and case law stating that "England's legal advice privilege was 'substantively identical' to New York's attorney-client privilege." Dkt. No. 192 at p. 6 (citation omitted).

the present issues are governed by state law, North River cited exclusively to federal authority in support of its arguments.

In light of the parties' failure to provide any support or explanation for their differing contentions as the law to be applied, the Court ordered the parties to submit supplemental briefing on this issue. Plaintiffs' supplemental brief, which makes no mention of Plaintiffs' initial contention that the Reinsurance Contracts are governed by the law of England and Wales, asserts that in cases such as the present where non-federal claims are raised and the Court's jurisdiction arises from the Foreign Sovereign Immunities Act, foreign states are subject to the "'same rules of liability'" as private parties and "the choice-of-law rules of the forum state supply the rule of decision." Dkt. No. 223 at 1 (citing *Cassirer v. Thyssen-Bornemisza Collection Found.*, 212 L. Ed. 2d 451, 142 S. Ct. 1502, 1508 (2022)). Thus, Plaintiffs contend, "New Jersey state law must also supply the choice of law with respect to issues of privilege," and because there is no conflict "between the jurisdictions with a possible interest in resolution of this issue,"[12] the privilege law of New Jersey, the forum state, applies. *Id.* at p. 1-3. In its supplemental brief, North River argues that federal common law applies to questions of attorney client privilege in this matter. *See* Dkt. No. 219.

Although both parties have changed their positions as to the law to be applied to the present issues of attorney-client privilege since their initial briefing, they both mention the application of New Jersey law and the Court agrees with Plaintiffs that in matters where the Court's jurisdiction arises from the Foreign Sovereign Immunities Act, courts are to apply "the forum State's choice-of-law rule, not a rule deriving from federal common law." *Cassirer,* 212 L. Ed. 2d 451, 142 S. Ct. at 1504. Thus, because, according to the parties, there is no conflict between the jurisdictions

---

[12] In their supplemental brief, Plaintiffs list Delaware, Pennsylvania and New Jersey at the "jurisdictions with a possible interest in the resolution of this issue . . . ." Dkt. No. 223 at p. 3.

with a possible interest in resolution of this issue, the Court finds that the privilege law of New Jersey, the forum state, applies.

Finally, as to the specific question of the law to be applied to North River's assertion of a mediation privilege, the parties agree, at least on some level, that Pennsylvania's mediation privilege applies.[13] Thus, the Court will apply Pennsylvania law to North River's assertion of privilege with respect to the Mediation Documents.

In addition to the choice of law governing the parties' privilege disputes, the parties disagree as to the proper standard of law to be applied to their claims in the matter generally, which in turn impacts the scope of permissible discovery. North River contends that the discovery sought from its attorneys is irrelevant because at issue in this case is whether North River's settlement and allocation decisions were objectively reasonable under the "follow the settlements" doctrine. Dkt. No. 192 at p. 18. "The follow-the-fortunes doctrine significantly restricts a reinsurer's ability to challenge the coverage decisions that led to its liability to the insurer" and "insulates a reinsured's liability determinations from challenge by a reinsurer unless they are . . . in bad faith, or the payments are clearly beyond the scope of the original policy." *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 149 (3d Cir. 2010) (internal citations and quotations omitted). "In other words, a reinsurer seeking to avoid payment must show either that the coverage decisions that led to the reinsurer's liability to the insurer were made in bad faith, or that the coverage provided clearly fell outside the scope of the policies the reinsurer agreed to reinsure." *Id.* (citations omitted). "Otherwise, the reinsurer must simply cover the losses allocated to it." *Id.* at 150.

---

[13] Plaintiffs argue that Pennsylvania's mediation privilege governs North River's present assertion of privilege because Pennsylvania is "the state with the 'most significant relationship'" to the communications at issue and that, as such, New Jersey's choice-of-law rules dictate the application of Pennsylvania law. Dkt. No. 223 at p. 1. North River also argues that Pennsylvania law governs its claims of privilege over the Mediation Documents. Dkt. No. 192 at p. 19-20.

Plaintiffs claim, with little to no explanation or supporting evidence, that no "'follow the settlements' provision applies to the parties' contract," and that the contracts at issue in this matter are "governed by the Law of England and Wales," which applies a "'real basis' standard that looks at the real basis for a settlement to test the allocation" instead of the "objectively reasonable" standard North River claims.[14] Dkt. No. 222 at p. 13. In the absence of any explanation by Plaintiffs or substantive discussion by the parties as to the law applicable to the underlying contracts at issue, the Court declines to make any substantive ruling as to the standard of law to be applied to a determination of the parties' claims in this matter in the context of the present discovery motion.

However, even if the insurance contracts at issue are found to incorporate a follow the fortunes provision, the application of the follow the fortunes doctrine to "post-settlement allocation decisions does not leave a reinsurer without protection" or act as a bar to Plaintiffs' seeking discovery regarding North River's allocation decisions because "[t]hose allocations must still have been in 'good faith' to be binding on the reinsurer." *Travelers*, 609 F.3d at 158 (internal citations and quotations omitted). To establish a breach of the duty of good faith, "the reinsurer must either provide direct evidence that the insurer was motivated primarily by reinsurance considerations, or show that the after-the-fact rationales offered by the insurer are not credible." *Id.* at 159. Thus, as relates to the present motion, reinsurers are entitled to discovery relevant to the reasonableness of the insurer's allocation decisions. *See Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209 CSH, 2013 WL 1409889, at *1 (D. Conn. Apr. 8, 2013) (granting reinsurer's motion to compel discovery related to insurer's allocation decisions).

---

[14] The Court notes that Plaintiffs, in their Complaint, allege that the "JU Reinsurance Contracts do not incorporate a 'follow the settlements' or 'follow the fortunes' provision." FAC at ¶ 50. In its Answer to the FAC, North River denies Plaintiffs' assertion that the relevant contracts do not incorporate "follow the settlements" or "follow the fortunes" provisions. Dkt. No. 130 at ¶ 50.

Although Plaintiffs are entitled to discovery related to the MSA Settlement and North River's allocation decisions, Plaintiffs contend that the scope of permissible discovery in this context includes all relevant privileged communications and work product. To that end, Plaintiffs seek the entry of an order requiring North River to produce all documents responsive to Plaintiffs' document requests which were "previously withheld as privileged." Dkt. No. 190-1 at p. 2. The entry of such an order, without limitation, requiring North River to produce any and all documents responsive to Plaintiffs' immensely broad discovery requests previously withheld as privileged is neither justified by Plaintiffs' arguments nor supported by any authority cited by Plaintiffs. While courts have indeed affirmed the relevance of discovery related to an insurer's allocation decisions, insurers are not barred from asserting claims of privilege over otherwise relevant discovery. *See Travelers*, 2013 WL 1409889, at *10 (stating that ruling on motion to compel "does no more than decide [reinsurer] is entitled to discovery on the facts relevant to the issues" of the good faith of the insurer's allocation decisions and inviting insurer to file separate motion to address assertions of attorney-client privilege). However, although the Court declines to accept Plaintiffs' assertion that North River is barred from asserting privilege over any documents relating the MSA Settlement or allocation, the Court will address, to the extent the parties have provided sufficient detail to do so, the parties' arguments as to the specific categories of information Plaintiffs seek.

The documents sought by Plaintiffs fall into three broad categories. First, Plaintiffs request documents related to the MSA Settlement, including North River's pre-settlement analysis, North River's payments to MSA and North River's allocation. Secondly, Plaintiffs seek all documents, including those not in North River's possession, relating to work performed by Bates White, which is identified by North River as "an economic consultant providing modeling services to North River's attorneys." Dkt. No. 192 at p. 5. The final category seeks documents related to various

mediations between North River and MSA, which have been withheld by North River on the basis of Pennsylvania's mediation privilege. The Court will address each category in turn.

### A. Documents Related to the North River's Payments to MSA and the MSA Settlement and Allocation ("Category A")

In Category A, Plaintiffs seek a vast universe of documents including all documents related to the MSA Settlement, any and all payments, considered or actual, by North River to MSA, including the 2017 Payment, and the allocation of any amounts paid by North River to MSA, which have been withheld by North River on the basis of privilege.[15] Plaintiffs have failed to present the Court with specific disputes to resolve, and instead appear to seek sweeping rulings as to North River's obligation to produce vastly broad categories of documents and the general applicability of complex areas of privilege. Thus, while the Court cannot make specific determinations or rulings, the Court will address the parties' arguments generally.

Category A includes documents withheld by North River under both the attorney client and work product privileges. As set forth above, the Court applies New Jersey law to North River's assertions of the attorney-client privilege. The attorney-client privilege exists to promote full and frank discussions between attorneys and their clients, *see United Jersey Bank v. Wolosoff*, 196 N.J. Super. 553, 561 (App. Div. 1984), and protects confidential communications made in the course

---

[15] At issue in Category A are Plaintiffs' Requests for Production of Documents ("Plaintiffs' RFPs") Nos. 10-16. *See* Dkt. No. 220, Plaintiffs' RFPs. Specifically, Plaintiffs seek "[a]ll documents concerning the 2017 MSA Payment, including all documents concerning the decision to make the 2017 MSA Payment" (RFP No. 10), "[a]ll documents concerning the MSA Settlement, including all documents concerning the negotiation of and decision to enter into the MSA Settlement" (RFP No. 11), "[a]ll documents concerning any allocation of any possible or actual payments to MSA under the MSA Policies considered by [North River], whether or not such payments were made or allocations adopted, including any analysis of the same" (RFP No. 12), "[a]ll documents concerning the allocation of the 2017 MSA Payment or concerning consideration or analysis of any allocation of the 2017 MSA Payment" (RFP No. 13), "[a]ll documents concerning the allocation of MSA Settlement Payment or consideration or analysis of any allocation of the MSA Settlement Payment" (RFP No. 14), "[a]ll documents [North River] contend[s] support[s] [North River's] decision to allocate the 2017 MSA Payment and the MSA Settlement Payment in the manner that they were allocated" (RFP No. 15), and "[a]ll documents concerning [North River's] allocation of amounts [North River] paid with respect to the MSA Claims" (RFP No. 16). *Id.* The Court notes that Plaintiffs have only provided the Court with North River's responses to its RFPs, which do not include the definitions of the terms utilized by Plaintiffs in its RFPs.

of a professional relationship. *See* N.J.S.A. 2A:84A-20; *Rivard v. Am. Home Prod., Inc.*, 391 N.J. Super. 129, 153 (App. Div. 2007).

A communication made in the course of a relationship between lawyer and client "shall be *presumed* to have been made in professional confidence unless knowingly made within the hearing of some person whose presence nullified the privilege." N.J.R.E. 504(3) (emphasis added). Despite the presumption of confidentiality, "the essence of the privilege" is limited to communications intended to be confidential. *State v. Schubert*, 235 N.J. Super. 212, 220-21 (App. Div. 1989), *certif. denied*, 121 N.J. 597 (1990). The party asserting the privilege bears the burden to prove that it applies to any given communication. *Horon Holding Corp. v. McKenzie*, 341 N.J. Super. 117, 125 (App. Div. 2001).

The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3) and exempts from discovery "documents and tangible things that are prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). The doctrine itself "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661–62 (3d Cir. 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). The party asserting work product protection bears the burden to show that the doctrine applies. *In re Hum. Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 157 (D.N.J. 2008), *appeal denied, judgment aff'd,* No. CIV. 06-135, 2009 WL 1097671 (D.N.J. Apr. 23, 2009) (citing *Conoco, Inc. v. U.S. Dep't of Justice,* 687 F.2d 724, 730 (3d Cir. 1982)).

Plaintiffs' objection to North River's assertions of privilege as to the documents in category A is two-fold. First, Plaintiffs take issue with North River's assertions of privilege over documents related to two individuals identified as Richard J. Fabian and Bryce Larrabee, who were employed

as in-house counsel and involved in the representation of North River in the Coverage Actions, contending that any documents withheld on the basis that Mr. Larrabee and Mr. Fabian are attorneys are not in fact privileged because "they were not acting as attorneys with respect to their settlement and allocation decisions." Dkt. No. 222 at p. 15. Secondly, as to the remainder of the documents, Plaintiffs do not appear to argue that they are not properly designated as privileged but rather that North River has waived any privilege protecting the documents at issue from disclosure.

The Court will first address Plaintiffs' assertion that no privilege applies to shield documents related to the settlement and allocation decisions of Mr. Larrabee and Mr. Fabian. Mr. Larrbae and Mr. Fabian were at the time of the Coverage Actions, and are presently, employed by The RiverStone Group ("RiverStone"). *See* Declaration of Bryce Larrabee, Dkt. No. 192-3 at ¶ 2; Declaration of Richard J. Fabian, Dkt. No. 192-2 at ¶ 2. RiverStone is "the affiliate of and the claims manager of the Crum and Forster companies, including North River, for the policies issued to [MSA]." Larrabee Decl. at ¶ 2.

During the relevant time period, Mr. Larrabee and Mr. Fabian served as in-house counsel for RiverStone and were involved in the representation of North River in connection with the Coverage Actions and the allocation of the MSA Settlement. *Id.*; Fabian Decl. ¶ 2. Mr. Larrabee states that from 2006 to approximately 2010, he "also served as the claim adjuster on the MSA file in addition to representing North River in the [Coverage Actions]" and that at "some point in 2010, the claim adjuster role was transferred to other RiverStone personnel." Larrabee Decl. at ¶ 2. From 2010 through the execution of the MSA Settlement, Mr. Larrabee and Mr. Fabian were "primarily responsible for recommending and implementing North River's legal strategy" in the Coverage Actions and MSA Settlement and for the allocations of North River's payments to MSA. *Id.* at ¶¶ 4, 11.

According to Plaintiffs, North River has "withheld nearly 5,000 internal documents on the sole basis that either [Mr.] Larrabee or [Mr.] Fabian are attorneys." Dkt. No. 222 at p. 15. Of the documents withheld, Plaintiffs claim that approximately 1,000 are communications solely between Mr. Larrabee and Mr. Fabian and approximately 1,900 are "identified solely as work product." *Id.* Plaintiffs appear to argue that although Mr. Larrabee and Mr. Fabian are attorneys who were serving as in-house counsel with respect to the MSA Settlement, North River is barred from asserting claims of privilege over documents related to Mr. Larrabee and Mr. Fabian because "the handling of insurance claims – even by an attorney – is not a legal function; it is a business function, and it is not privileged" and Mr. Larrabee and Mr. Fabian, Plaintiffs claim, were not acting as attorneys with respect to their settlement and allocation decisions. *Id.* at p. 16 (citing *Zawadsky v. Bankers Standard Ins. Co.*, No. CV 14-2293 (RBK/AMD), 2015 WL 10853517, at *1 (D.N.J. Dec. 30, 2015)).

In response, North River acknowledges that "a party must disclose the underlying facts of an action, and cannot shield those facts, even if they are within the control of an attorney." Dkt. No. 192 at p. 7 (citing *Upjohn v. United States*, 449 U.S. 383, 395-396 (1981)). In line with that acknowledgment, North River states that it has produced more than 15,000 non-privileged documents from the four attorney custodians North River has designated "to testify about the underlying facts and business decisions in the case." [16]  Dkt. No. 192 at p. 7.  However, North River argues, because it is "not uncommon . . . for privileged information to mingle with factual information, and there is nothing improper about an attorney divulging facts while keeping work

---

[16] The four attorney custodians at issue are Mr. Larrabee, Mr. Fabian, Dennis Brown, Esq. and Christopher Carroll, Esq. *See* Dkt. No. 191-6, North River's Federal Rule of Civil Procedure 26(a)(1) Disclosures at I. Mr. Brown and Mr. Carroll represented North River as outside counsel in connection with the Coverage Actions and MSA Settlement. *Id.*

product and advice confidential," it has properly withheld privileged communications and work product generated by the attorneys at issue. *Id.* at p. 8.

Plaintiffs take issue with North River's assertion of both the attorney client and work product privileges over documents related to Mr. Larrabee and Mr. Fabian. Although the attorney-client privilege is narrowly construed because it "obstructs the truth-finding process," the privilege is not disfavored, and where applicable, "must be given as broad a scope as its rationale requires." *Wolosoff*, 196 N.J. Super. at 561-62. Courts should be cautious in their application of the privilege mindful that "it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). While "[c]onfidential communications relaying factual information in furtherance of an attorney's representation are privileged . . . underlying facts themselves are *never* privileged." *Margulis v. Hertz Corp.*, No. CV 14-1209 (JMV), 2017 WL 772336, at *5 (D.N.J. Feb. 28, 2017) (citing *Fisher*, 425 U.S. at 403; *In re Hum. Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 164 (D.N.J. 2008) (emphasis in original).

To prevent the abuse of the privilege, it does not apply simply because the communication was made to a licensed attorney. *In re Human Tissue,* 255 F.R.D. at 164. Instead, the privilege only applies if the communication was "made to an attorney *acting as an attorney*." *Margulis*, 2017 WL 772336, at *5 (citing *In re Human Tissue,* 255 F.R.D. at 164) (emphasis in original). With respect to in-house counsel, the communications at issue must have been "made to in-house counsel in their professional capacity as lawyers" and "[c]ommunications which relate to business rather than legal matters do not fall within the protection of the privilege." *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990) (citations omitted).

Although this rule is clearly stated, its application is far from simple because "in the corporate community, legal advice 'is often intimately intertwined with and difficult to distinguish from business advice.'" *Leonen*, 135 F.R.D. at 98-99 (quoting *Sedco Int'l SA v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982)). The relevant inquiry in the business versus legal context "is focused on whether the communication is designed to meet problems which can fairly be characterized as predominately legal." *Leonen*, 135 F.R.D. at 99 (citation omitted). To meet this standard, the claimant should demonstrate "that the communication would not have been made but for the client's need for legal advice or services." *Id.*

The work-product doctrine provides qualified immunity from discovery to certain material prepared by or at the direction of an attorney in anticipation of litigation. See Fed. R. Civ. P. 26; *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003). The party asserting the doctrine bears the burden of proving that a document is protected. *In re Riddell Concussion Reduction Litig.*, C.A. No. 13-7585 (JBS/JS), 2016 WL 7108455, at *6 (D.N.J. Dec. 5, 2016) (citation omitted). To meet this burden, the "party claiming protection must demonstrate the precise manner in which a document is protected." *Id.* "Blanket assertions do not suffice." *Id.*

In order for a document to qualify as protected work-product, "it must be reasonably clear based on the surrounding facts and the nature of the materials" that the document was prepared because of anticipated litigation. *Id.* (quoting *Reich v. Hercules, Inc.*, 857 F. Supp. 367, 373 (D.N.J. 1994)). Documents prepared in the ordinary course of business or created for another purpose are not protected, regardless of their utility in subsequent litigation. *Id.* Thus, a party seeking to invoke the work-product doctrine must prove at least the following two elements: (1) that a document was prepared because of reasonably anticipated litigation and (2) that the document "was prepared because of the prospect of litigation and for no other purpose." *Id.*

Whether a document was prepared in anticipation of litigation is a difficult determination. A party must show "that there existed an identifiable and specific claim of impending litigation when the materials were prepared." *Id.* at *7; *see Rockwell Automation, Inc. v. Radwell Int'l, Inc.,* C.A. No. 15-5246 (RBK/JS), 2019 WL 1864198, at *3 (D.N.J. Apr. 25, 2019). "The mere involvement of an attorney does not, in itself, evidence that a document was prepared in anticipation of litigation." *Riddell*, 2016 WL 7108455, at *7. However, a document may still be protected even though it was not prepared by an attorney. *Id.*; *see Supernus Pharm., Inc. v. TWI Pharm., Inc.,* C.A. No. 15-369 (RMB/JS), 2016 WL 5339594, at *4 (D.N.J. June 21, 2016). In order to qualify as work-product the "dominant purpose" in preparing the document must be the concern about potential litigation and that concern must be objectively reasonable. *Riddell*, 2016 WL 7108455, at *7; *see also Littlejohn v. Vivint Solar*, C.A. No. 16-9446 (NLH/JS), 2018 WL 6705673, at *2 (D.N.J. Dec. 20, 2018) ("[D]ocuments are protected if their primary purpose was to assist counsel to render legal advice."); *Supernus Pharm., Inc.*, 2016 WL 5339594, at *4 (concluding the subject material was not protected despite counsel's involvement because the primary purpose in preparing the material "was not to prepare for litigation").

In support of their assertion that the withheld documents are not protected attorney client communications or work product, Plaintiffs rely primarily on *Certain London Mkt. Co. Reinsurers v. Lamorak Ins. Co.*, No. CV 18-10534-NMG, 2020 WL 6048345, at *1 (D. Mass. Oct. 13, 2020). *Lamorak* involved a dispute between a reinsurer and an insurer over the insurer's allocation of an underlying judgment and settlement. *Lamorak*, 2020 WL 6048345, at *1. The reinsurer filed a motion to compel the production of forty-two emails withheld by the insurer on the basis of privilege. *Id.* at *2. The emails at issue involved an attorney who was employed by the claim manager for the insurer and had "acted as administrator" for the insurer with respect to the claims

at issue and were primarily between that attorney and other employees of the claims manager, some of whom were also attorneys. *Id.* Some of the emails at issue included a consulting firm which had assisted the attorney at issue in the settlement negotiations related to the underlying claims "by creating spreadsheets that quantified certain . . . exposure scenarios at [the attorney's] direction." *Id.* The emails were from a three-week period covering the "precise time period" in which the insurer was settling the underlying litigation and "drafting the [a]llocation to bill [the reinsurer]." *Id.*

The court reviewed the contested documents, all of which related "to the allocation of the settlement amount for purpose of the reinsurance billing," *in camera* and found none of the documents, with one exception, "explicitly [sought] or [gave] legal advice." *Id.* at *4. The court, noting that the attorney at issue never stated that he represented the insurer but had instead acted as an "administrator" for "certain insurance business, including claims," found that the attorney-client privilege did not protect the documents at issue because the attorney "was not representing [the insurer] as counsel in a traditional sense" and his "work on behalf of [the insurer] [was] akin to that of a consultant rather than an attorney representing a client." *Id.*

As to the insurer's claim that emails at issue were protected work product, the court observed that "in insurance cases, communications with an attorney are not protected under the attorney-client privilege or work-product doctrine, where the attorney performs the role of a claims adjuster and does not provide legal advice," and "in a typical reinsurance case, the preparation of the reinsurance allocation is a claims function that a business person undertakes to support a reinsurance billing, and so materials pertaining to that process are not privileged." *Id.* at *5 (citations omitted). Furthermore, the court remarked, where the reasonableness of the allocation is "at the heart of the dispute," the reinsurer is "entitled to obtain documents that test whether the

[a]llocation is consistent with [the insurer's] actual exposure." *Id.* Thus, particularly where the insurer has proffered an attorney and a consultant utilized by that attorney "as fact witnesses concerning the reasonableness of the [a]llocation," it would be "unfair for [those] witnesses to be able to assert, on the one hand, that the [a]llocation was reasonable, and to explain why, but at the same time, refuse to produce documents or answer certain questions about how the [a]llocation was derived, claiming that such information is protected." *Id.*

The court, acknowledging that that the question at issue was not "an easy one" because the materials at issue "reflect[ed] complex legal analysis" and were generated when the insurer was "embroiled in litigation" with its reinsurer, ultimately found that "the preparation of the [a]llocation was 'ordinary course' insurance claims adjustment, and not legal advice or work-product privileged from discovery." *Id.* Additionally, the court found that even assuming, *arguendo*, that the documents at issue were protected work product, they would be discoverable under Rule 26(b)(3) because the reinsurer had a "substantial need" for the documents and could not get them in any other way. *Id.*

Although the underlying claims and arguments at issue in *Lamorak* are undeniably similar to those asserted by the parties in this matter, the Court does not agree with Plaintiffs that the court in *Lamorak* considered the "exact issue[s]" and rejected "the same arguments by a cedent" as presently before this Court. Dkt. No. 222 at p. 19. Indeed, there are several significant differences in the circumstances which led the court to its findings in *Lamorak* and those now before this Court.

The first and most insurmountable difference is that the dispute between the parties in *Lamorak* was limited to forty-two emails and attachments. Here, as stated by North River, "Plaintiffs have asked for untold thousands of documents" and "have not even identified the

specific documents they want rulings on, let alone asked for *in camera* inspection of any individual documents or set of documents." Dkt. No. 192 at p. 9. Instead, Plaintiffs have "simply asked this Court to order production of 'documents previously withheld as privileged.'" *Id.*

While North River, as the party asserting the privilege, bears the burden of establishing that any given document is a privileged attorney-client communication or work product, and while the Court is tasked with "carefully review[ing]" disputed documents "to determine their nature and content," Plaintiffs' wholesale approach to the present dispute has left North River in an unwinnable position and the Court in an untenable one. *Wolosoff*, 196 N.J. Super. at 563. Unlike the reinsurer in *Lamorak* which took issue with the insurer's assertions of privilege as to a specific set of documents, Plaintiffs, without explanation or limitation, ask to the Court to find that every one of the approximately 5,000 documents withheld by North River related to Mr. Larrabee and Mr. Fabian as attorney-client communications or work product are not in fact privileged.

Secondly, contrary to Plaintiffs' contention that *Lamorak* supports a finding that any and all documents related to the allocation of a settlement for the purpose of a reinsurance billing are not privileged, the court in *Lamorak* found that one of the documents at issue, which "ask[ed] for legal advice" from another attorney representing the insurer in the settlement, was protected from disclosure to the reinsurer by the attorney-client privilege. *Lamorak*, 2020 WL 6048345, at *4. Thus, to the extent that any of the documents withheld "explicitly seek or give legal advice," they may be properly withheld as subject to the attorney-client privilege under *Lamorak*.

Thirdly, the documents at issue in *Lamorak* all related to the "allocation of the settlement amount for purpose of the reinsurance billing" and covered the "precise [three-week] period" in which the insurer was settling the underlying litigation and "drafting the [a]llocation in order to bill [the reinsurer]." *Lamorak*, 2020 WL 6048345, at *2, *4. Here, Plaintiffs demand "untold

thousands of documents" over "many" unspecified years, "the vast majority of which were generated *before* the MSA [S]ettlement was finalized." Dkt. No. 192 at p. 9.

Finally, the contested documents in *Lamorak* primarily involved an individual, who although a licensed attorney, "never state[d] that he represent[ed]" the insurer and instead performed work on behalf of the insurer "akin to that of a consultant rather than an attorney representing a client." *Lamorak*, 2020 WL 6048345, at *4. In contrast, Mr. Fabian states that, acting as in-house counsel, he was "involved in the representation of North River" in connection with the Coverage Actions and the allocation of the MSA Settlement and at all relevant times "acted to provide legal counsel" pertaining to such matters. Dkt. No. 192-2, Fabian Decl. at ¶ 2-3. Mr. Larrabee similarly states that although he served as the claims adjustor on the "MSA file" from 2006 until approximately 2010 when "the claim adjustor role was transferred to other RiverStone personnel," he "acted to provide legal counsel" pertaining the Coverage Actions and MSA Settlement and allocation. Dkt. No. 192-3, Larrabee Decl. at ¶ 2-3.

The foregoing distinctions lead the Court to reject Plaintiffs' present contention that *Lamorak* supports a finding that every single document related to Mr. Fabian and Mr. Larrabee are not protected attorney-client communications or work product. *Lamorak* does, however, reinforce that "in a typical reinsurance case, the preparation of the reinsurance allocation is a claims function that a business person undertakes to support a reinsurance billing, and so materials pertaining to that process are not privileged." *Lamorak*, 2020 WL 6048345, at *5.

Accordingly, although the Court is not in a position presently, based on the sweeping arguments made by Plaintiffs, to make specific determinations as to North River's claims of privilege, the Court does not foreclose the possibility, if not the likelihood, that more precise challenges by Plaintiffs to certain assertions of privilege by North River's as to certain documents

related to Mr. Larrabee and Mr. Fabian may result in a finding that North River has indeed improperly withheld communications involving Mr. Larrabee or Mr. Fabian when they were acting outside their capacity as attorneys or documents reflecting North River's "'insurance administrators' rationale for the billing to [Plaintiffs], which would have been prepared whether there was litigation or not." *Lamorak*, 2020 WL 6048345, at *5. Thus, while the Court denies Plaintiffs' present motion to compel the production of all documents related Mr. Larrabee and Mr. Fabian withheld as subject to the attorney-client or work product privilege, it is denied without prejudice to Plaintiffs raising distinct challenges to North River's assertions of privilege after appropriate efforts have been undertaken to present an appropriately narrowed and well-defined dispute to the Court for adjudication.[17]

The Court now turns to Plaintiffs' contention that North River has waived any privilege as to seemingly all withheld responsive documents "by offering only its *counsel* to justify its allocation decisions."[18] Dkt. No. 222 at p. 25 (emphasis in original). Plaintiffs argue that North

---

[17] The Court acknowledges that Plaintiffs take issue with North River's privilege log, which Plaintiffs claim "redacts the subject lines of approximately 9,000 of the 12,000 logged Larrabee documents" and includes "generic subject lines from which nothing can be ascertained" for the remaining 3,000 documents." Dkt. No. 222 at p. 11. Plaintiffs claim similar deficiencies as to the "logged Fabian documents." *Id.* In response, North River states that its privilege logs were created in compliance with the parties' agreed upon discovery protocol and, in light of the vast amount of documents at issue, were "'auto-generated,' meaning that certain metadata fields such as subject line, document titles, authors, senders, etc., were extracted into a spreadsheet to constitute the logs in order to minimize the burden of individually describing each document." Dkt. No. 192 at p. 7-8. North River further claims that Plaintiffs have asked for "clarification" on over 8,000 entries in its privilege log, in response to which North River reviewed the entries at issue and either provided additional information or produced any inadvertently withheld documents and notes that Plaintiffs' present motion "does not identify any specific privilege log entries they believe are insufficient." *Id* at p. 8. Because North River's privilege log was generated in compliance with the parties' agreed upon discovery protocol, and because Plaintiffs have not identified specific deficiencies in the information provided by North River, the Court declines to find that the lack of detail in North River's privilege log justifies negating all assertions of privilege therein. To the extent Plaintiffs take issue with North River's privilege log, they are to raise those issues with North River and attempt to resolve any disputes via meet and confer prior to requesting Court intervention.

[18] In addition to their assertion that North River has waived any privilege by putting the advice of its counsel at issue, Plaintiffs contend that North River must produce attorney work product under Fed. R. Civ. P. 26 (b)(3), which provides that materials that are prepared in anticipation of litigation may nevertheless be discoverable if they are otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i), (ii). As with Plaintiffs' previous arguments, while the Court does not disagree that Plaintiffs may have a substantial need for certain specific work product documents withheld by North River related to the allocation of the MSA

River "has announced it will present attorneys, *and only attorneys*, to justify its payment, settlement and allocation decisions" and in doing so "has taken clear *affirmative steps* to place its counsel's advice and work product concerning these subjects at issue and waived privilege." *Id.* at p. 26 (emphasis in original).

Unlike the federal privilege, the New Jersey state attorney-client privilege is qualified and may be required to yield when the party seeking to pierce the privilege establishes: (1) there is a legitimate need to reach the evidence sought to be shielded, (2) there is a showing of relevance and materiality of that evidence to the issue before the court, and (3) the party seeking to bar assertion of the privilege has shown by a fair preponderance of the evidence, including all reasonable inferences, that the information cannot be secured from any less intrusive means. *Leonen*, 135 F.R.D. at 100 (citing *In re Kozlov,* 79 N.J. 232, 243–44 (1979)).

Cases applying the *Kozlov* factors have generally upheld the attorney-client privilege. *Kinsella v. Kinsella*, 150 N.J. 276, 299, 696 A.2d 556, 568 (1997) (citations omitted). "The typical setting in which the attorney-client privilege has *not* been sustained under *Kozlov* is where the party claiming the privilege has implicitly waived it by putting the confidential communications 'in issue' in the litigation." *Id.* at 300 (emphasis added). Indeed, the need prong of *Kozlov* can only be satisfied: "(1) where a constitutional right is at stake, or (2) a party has explicitly or implicitly waived the privilege." *State v. Mauti*, 208 N.J. 519, 538-39 (2012).

"[A] privilege may be waived 'implicitly' where a party puts a confidential communication 'in issue' in a litigation." *Id.* at 532 (citing *Kinsella,* 150 N.J. at 300). This waiver occurs in circumstances where "the party who places a confidential communication in issue voluntarily creates the 'need' for disclosure of those confidences to the adversary." *Mauti*, 208 N.J. at 532.

---

Settlement, Plaintiffs' request is impermissibly broad and the Court declines to find that Plaintiffs have a substantial need for any and all privileged documents responsive to Plaintiffs' RFP Nos. 10-16.

For example, "a plaintiff in a medical malpractice action cannot claim that her medical records are privileged" and "where a party to a real estate transaction alleges misrepresentations during negotiations, she cannot claim attorney-client privilege in respect of her attorney's participation in those negotiations." *Id.* (citations omitted).

Plaintiffs argue that North River has implicitly waived any privilege, including any privilege that involves its outside counsel, by offering only its counsel to justify its allocation decisions and contends that North River "cannot offer its counsel to justify its decisions and then shield documents relating to those decisions as privileged." Dkt. No. 222 at p. 27. North River, Plaintiffs claim, cannot shield privileged documents by claiming that its counsel "will be merely testifying to 'business decisions and facts'" because North River's attorneys only have knowledge regarding North River's business decisions "by virtue of their communications with and representation of North River." *Id.* Furthermore, Plaintiffs contend that any testimony by North River's counsel will necessarily implicate attorney client communications and work product and therefore North River cannot offer its attorneys as fact witnesses regarding only unprivileged information. *Id.*

In response, North River argues that it has properly protected its privileged documents and has not put the advice of counsel at issue and claims that "Plaintiffs have not pointed to a single piece of privileged information or attorney advice that North River has pointed to, relied upon, or put at issue in this case." Dkt. No 192 at p. 11. Instead, North River contends, Plaintiffs imply "that attorneys are not competent to testify about facts unless they also divulge any and all advice and privileged information related to those facts," which misinterprets the applicable law. *Id.* Ultimately, North River argues that the act of disclosing its attorneys as witnesses does not mean it will use privileged information in support of its defense because its counsel will "testify about

the facts surrounding the decision to settle and allocate the loss without reliance on any of the privileged or protected materials that Plaintiffs seek to compel." Dkt. No. 192 at p. 12.

The broad construction of the at issue waiver advanced by Plaintiffs has been rejected by the United States Court of Appeals for the Third Circuit. *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994). In determining whether a party has waived the attorney-client privilege, the Third Circuit, in *Rhone-Poulenc* explained that a party can waive the privilege "by asserting claims or defenses that put his or her attorney's advice in issue in the litigation . . . [or] by asserting reliance on the advice of counsel as an affirmative defense." *Rhone-Poulenc,* 32 F.3d at 863 (internal citations omitted). "[W]here a party is accused of acting willfully, and where that party asserts as an essential element of its defense that it relied upon the advice of counsel, the party waives the privilege regarding communications pertaining to that advice." *Id.* (internal citations omitted). However, the Third Circuit made clear:

> [a]dvice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner. The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication. *Id.* (citations omitted).

*Id.* (citing *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363, 370 (D.N.J. 1992); *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 71 (D.N.J. 1992)). "While the attorney's advice may be relevant to the matters in issue, the privilege applies as the interests it is intended to protect are still served by confidentiality." *Id.* at 864.

Additionally, courts have made clear that in the reinsurance context, an insurer does not place the advice of is counsel "in issue" simply by seeking coverage. *See North River Ins. Co.*, 797 F. Supp. at 370-71 ("[reinsurer's] argument that [insurer's] merely placing the broad question of coverage in issue somehow makes it fair game for [reinsurer] to discover confidential attorney-

33

client communications is a misconstruction of the 'in issue' doctrine."); *NL Indus., Inc. v. Com. Union Ins. Co.*, 144 F.R.D. 225, 233 (D.N.J. 1992) (the defendant insurer's claim that its insured had "put its conduct in issue by attempting to obtain coverage, and therefore ha[d] impliedly waived any privileges with respect to the litigation files in issue . . . is not a correct interpretation of the relevant case law"); *Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co.*, 40 A.D.3d 486, 492, 837 N.Y.S.2d 616 (2007) (rejecting reinsurer's contention that insurer waived privilege by placing "'at issue' the reasonableness and good faith of the settlement of the underlying action and the reasonableness and good faith of the allocations"); *AIU Ins. Co. v. TIG Ins. Co.*, No. 07CIV7052(SHS)(HBP), 2008 WL 5062030, at *4 (S.D.N.Y. Nov. 25, 2008) (finding that insurer's "act of seeking coverage [was] not a sufficient 'affirmative act'" to place the privileged documents sought by the reinsurer at issue).

Here, although Plaintiffs argue that North River has waived any privilege by offering its counsel to "justify its allocation decisions," North River has not asserted any claim or defense in this matter that rests on the legal advice of its counsel, nor has it attempted to prove any claim or defense by disclosing such advice. Dkt. No. 222 at p. 25. While the privileged documents Plaintiffs seek are undoubtedly relevant to the issues in this case, "[r]elevance is not the standard for determining whether privileged information should be produced, 'even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue.'" *United States v. Sensient Colors, Inc.*, No. CIV. 07-1275(JHR/JS), 2009 WL 2905474, at *8 (D.N.J. Sept. 9, 2009) (citing *Rhone-Poulenc,* 32 F.3d at 864).

The Court's finding that North River has not put the advice of its counsel at issue in this litigation is unchanged by Plaintiffs' emphasis on North River's identification of its counsel as fact witnesses. North River states that its counsel "will testify about the facts surrounding the decision

to settle and allocate the loss without reliance on any of the privileged or protected materials that Plaintiffs seek to compel." Dkt. No. 192 at p. 12. While Plaintiffs appear to contend that any explanation of North River's settlement and allocation decisions cannot be offered by its counsel without placing privileged documents at issue, attorneys may offer factual testimony without placing privileged communications and work product at issue. *See Target Corp. v. ACE Am. Ins. Co.*, 576 F. Supp. 3d 609, 619 (D. Minn. 2021) (finding no waiver of privilege in insurance dispute where an insured's attorney "offers objective, nonprivileged testimony about what the insured knew at the time of the [underlying] settlement.").

Based on the foregoing, the Court finds Plaintiffs have failed to demonstrate that North River has waived its privilege by placing the advice of its counsel at issue in this matter and has therefore failed to make the requisite showing under the first *Kozlov* factor. Although Plaintiffs do not address the second and third *Kozlov* factors, the Court finds that Plaintiffs have also failed to demonstrate, under the third *Kozlov* factor, that the privileged information they seek could not be obtained from any less intrusive source. Plaintiffs have not yet fully explored the non-privileged documentary evidence available to them nor have they taken the depositions of North River's attorneys who have been designed as witnesses. Unless and until Plaintiffs have explored the non-privileged evidence available them, including by securing non-privileged deposition testimony from North River's counsel, Plaintiffs cannot establish that the necessary information can only be obtained through privileged materials.

### B. Bates White Modeling ("Category B")[19]

At issue in Category B are Plaintiffs' RFPs requesting the production of all documents and communications arising from the work performed by Bates White for North River related to the

---

[19] Although Plaintiffs include their arguments with respect to the Bates White materials in their discussion of the materials addressed in Category A, the Court addresses the Bates White materials separately.

MSA Settlement and allocation, including all responsive documents "in Bates White's files." Dkt. No. 222 at p. 22, n. 21. Plaintiffs claim North River has withheld 432 communications involving Bates White and produced 268, "most of which lack any substance." Dkt. No. 222 at p. 10. According to Plaintiffs, North River "refuses to produce most documents related to earlier Bates White analyses," which Plaintiffs contend are inconsistent with the final allocation, or any "documents or communications related to [North River's] allocation except for the final output table." Dkt. No. 222 at p. 20. This refusal, Plaintiffs argue, is improper because the work performed by Bates White relates to business decisions and is therefore not entitled to work product protection. Additionally, Plaintiffs assert that North River's disclosure of the final Bates White analysis without objection demonstrates that the underlying communications and draft analyses are likewise not privileged.

In opposition, North River argues that the documents sought by Plaintiffs are protected "legal advice" and work product because the "question is whether the final settlement and allocation among the reinsured policies is objectively reasonable" and therefore North River's "internal considerations" prior to making its allocation decision are "irrelevant." Dkt. No. 192 at p. 10-11. North River claims that it while it will provide "documents and testimony about its business decision," the "assistance provided during privileged internal deliberations on how and when to settle [the Coverage Actions] is clearly work product and properly withheld." *Id.* at p. 11.

As with Category A, the parties have not provided the Court with enough detail regarding the parameters of their dispute to allow the Court to make any concrete determinations and the proper scope of the privilege asserted by North River is likely to exist somewhere between the parties' differing positions. Plaintiffs' arguments that the work done by Bates White relates largely to the allocation of the settlement, which is a business function, and that any previous allocation

analyses which are inconsistent with the final allocation would be highly relevant to the issues in this matter are well taken.[20] Likewise, the Court does not doubt that there are at least some documents responsive to Plaintiffs' requests that implicate privileged communications and work product which have been properly withheld by North River.

Accordingly, while the Court denies Plaintiffs' present motion to compel the production of the documents at issue in Category B, the Court directs North River to conduct a review of any responsive documents withheld as privileged communications or work product and to provide Plaintiffs with a detailed privilege log as to those documents. In doing so, North River is cautioned that documents reflecting the "rationale for the billing to [Plaintiffs], which would have been prepared whether there was litigation or not," are not privileged and must be produced to Plaintiffs. *Lamorak*, 2020 WL 6048345, at *5. If, following receipt of North River's forthcoming privilege log and any newly produced documents, Plaintiffs can articulate objections to particular documents or discrete categories of documents, Plaintiffs may request Court intervention.

### C. Mediation Documents ("Category C")

The details proved by the parties with respect to the mediations underlying North River's assertion of privilege as to the documents at issue in Category C are scarce. According to Plaintiff, North River has withheld 432 documents "as subject to some sort of mediation privilege" (the "Mediation Documents"). Dkt. No. 222 at p. 30. Neither party has provided the Court with a privilege log or any further information regarding the nature of the Mediation Documents.

---

[20] Plaintiffs rely on *Lamorak* in support of their request that North River be required to produce all communications and documents related to the modeling done by Bates White, including the materials in Bates White's files. However, as discussed in Category A, there are important distinctions between the circumstances before the Court in *Lamorak* and those present here, including that the attorney in *Lamorak* was not acting as legal counsel and that the consultant in *Lamorak* was proffered as a fact witness concerning the reasonableness of the allocation. *Lamorak*, 2020 WL 6048345, at *5.

North River claims that "[b]etween 2009 and 2018 North River and MSA were ordered by the Pennsylvania court to engage in mediation sessions, during which the parties relied upon the strong Pennsylvania state protections for the non-disclosure of mediation materials."[21] Dkt. No. 192 at p. 4-5. According to Mr. Larrabee, North River "participated" in mediations on "at least" November 24, 2009, November 10, 2010, November 2, 2011, November 4, 2011, November 13, 2012, December 19, 2012, February 14, 2013, October 4, 2017, March 7, 2018 and April 12, 2018. Larrabee Decl. at ¶ 5. Of the foregoing mediations, Mr. Larrabee claims that those taking place on November 10, 2010, October 4, 2017, March 7, 2018 and April 12, 2018 were "[o]rdered by [the] Pennsylvania court" and that "[t]he parties to the mediations in 2017 and 2018 were advised by the court-appointed mediator that the information exchanged or discussed would be protected by Pennsylvania's mediation privilege." *Id.* at ¶¶ 5, 7. North River has not provided any information regarding whether the mediation sessions included separate attempts at mediation or continuations of the same mediation or the identities of the mediator or mediators.

In pertinent part, Pennsylvania's statutory mediation privilege, 42 Pa.C.S.A. § 5949, provides as follows:

> (a) General rule—Except as provided in subsection (b), all mediation communications and mediation documents are privileged. Disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. Mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration proceeding.

"Mediation" is "[t]he deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute." 42 Pa.C.S.A. § 5949(c). A "mediation

---

[21] Although North River does not specify whether mediation was ordered in the PA Federal Action or the PA State Court Action, according to the Complaint the mediations which took place between MSA and North River were ordered by the court in the PA Federal Action. FAC at ¶ 132-35.

communication" is any communication, verbal, nonverbal, oral or written, that is "made by, between or among a party, mediator, mediation program or any other person present to further the mediation process when the communication occurs during a mediation session or outside a session when made to or by the mediator or mediation program." *Id.* A mediation document consists of "written material, including copies, prepared for the purpose of, in the course of or pursuant to mediation." *Id.* Subsection (b)(4) of the statute excludes from the privilege "[a]ny document which otherwise exists, or existed independent of the mediation and is not otherwise covered by this section." *Id.* at § 5949(b)(4). A settlement document, to the extent that it is introduced to enforce the settlement embodied by it, is also exempted from the privilege. *Id.* at § 5949(b)(1).

The Pennsylvania mediation privilege differentiates between mediation communications and mediation documents. As to mediation communications, in order for "statements made by a person present at the mediation session outside the mediation session" to be protected by Pennsylvania's mediation privilege, "they must either be made by the mediator or to the mediator." *Golon, Inc. v. Selective Ins. Co. of the Se.*, No. 17CV0819, 2017 WL 6059680, at *6 (W.D. Pa. Dec. 7, 2017). Thus, "discussions among parties outside the presence of the mediator and not occurring at a mediation proceeding are not privileged." *U.S. Fid. & Guar. Co. v. Dick Corp./Barton Malow*, 215 F.R.D. 503, 506 (W.D. Pa. 2003). Accordingly, if Plaintiffs are correct that North River has withheld "26 communications with MSA, made outside a mediation session, and not with the mediator," those communications are not protected by Pennsylvania's mediation privilege and must be produced to Plaintiffs. Dkt. No. 222 at p. 30.

Mediation documents, which include "[w]ritten material, including copies, prepared for the purpose of, in the course of or pursuant to mediation," are less easily defined. 42 Pa.C.S.A. § 5949(c). At the "'core' of these materials are documents such as mediation position papers and

specific information prepared for mediation sessions. Also included are other documents created by . . . the parties in preparation for the mediation sessions." *Dick Corp./Barton Malow*, 215 F.R.D. at 507. Documents "created subsequent to the mediation process may be protected by the privilege to the extent that they have a clear nexus to the mediation," such as "drafts of settlement proposals agreed upon at mediation." *Id.* Documents created subsequent to the mediation process, however, must be "tied" to the mediation or "subsequent activity by the mediator," and the mediation privilege, while protecting "mediator-brokered settlements," does not protect "settlements that were simply reached following a mediation." *Id.*

Plaintiffs argue generally that "North River cannot invoke [the] Pennsylvania mediation privilege to withhold the entirety of its settlement negotiations with MSA around the time of its mediations." Dkt. No. 222 at p. 33. As the party asserting the mediation privilege, North River "has the burden of establishing that it applies." *Dietz & Watson, Inc. v. Liberty Mut. Ins. Co.*, No. CIV.A. 14-4082, 2015 WL 356949, at *3 (E.D. Pa. Jan. 28, 2015). North River, citing Pennsylvania's mediation statute,[22] claims that it "participated in at least nine separate mediations, many of which included multiple telephonic and in-person mediation sessions, as well as continued involvement by the mediator in ongoing settlement discussions by email and telephone" and states that "documents qualifying for protection generated from those mediations have been withheld." Dkt. No. 192 at p. 20. North River argues that the documents it has withheld "were generated and protected in a state court proceeding, under Pennsylvania law, and should be accorded the protection they acquired at the time they were generated." *Id.* at p. 20.

---

[22] Because, as previously discussed, the Court applies state law to determination of privilege in this matter, and because both parties agree, at least in part, that Pennsylvania law applies to North River's claim of a mediation privilege, the Court need not address the parties' alternative arguments regarding the applicability of a federal mediation privilege.

In response to North River's assertion of privilege,[23] Plaintiffs argue that even to the extent the Mediation Documents are protected from disclosure by Pennsylvania's mediation privilege, North River has waived that privilege in two separate ways. First, Plaintiffs contend that "North River has put its settlement negotiations and mediation documents at issue" and "cannot offer evidence and testimony concerning the reasonableness of [the MSA Settlement] without disclosing the documents that led to that settlement." Dkt. No. 222 at p. 30. While not directly analogous, courts applying Pennsylvania's mediation statute to mediation documents and communications arising from mediation sessions between an insured and an insurer in a subsequent bad faith action have found that although the mediation documents and communications from the underlying action are indeed relevant in the subsequent lawsuit, "[t]he plain language of [Pennsylvania's mediation statute] bars use of mediation communications in any and all actions or proceedings subject only to the exceptions outlined" therein, and an "action alleging an insurer's failure to engage in good faith settlement negotiations" is not one of those exceptions. *Dietz & Watson,* 2015 WL 356949 at *4, *6.

Although this is not a bad faith action, the Court applies the same reasoning here. Pennsylvania's mediation statute sets forth certain exceptions, which include the introduction of a "settlement document" in "an action or proceeding to enforce the settlement agreement expressed in the document" and "relevant evidence in a criminal matter . . . ."  42 Pa.C.S.A. § 5949(b). The relevance of the circumstances of an underlying settlement facilitated or reached as a result of a mediation is not one of the enumerated exceptions. Accordingly, the Court finds that while the

---

[23] Although the burden is on North River to establish the privilege, the parties have failed to provide the requisite information required for the Court to make specific determinations regarding North River's assertion of Pennsylvania's mediation privilege. Accordingly, while the Court mindful that North River carries the applicable burden and therefore reserves any explicit findings as to whether North River has established the existence of the asserted privilege, the Court will address Plaintiffs' arguments of waiver to allow for a more efficient resolution of the parties' present disputes.

mediation communications and documents arising from mediations in the Coverage Actions may be relevant to the reasonableness of the settlement now at issue in this matter, that relevancy does not operate as a waiver of the mediation privilege.

Plaintiffs' second waiver argument was raised in their reply brief. *See* Dkt. No. 199-1. According to Plaintiffs, North River waived any mediation privilege with respect to certain mediation communications and/or documents when it provided those documents to its E&O Insurers. Specifically, Plaintiffs claim that North River, at a time when it was in an adversarial position with its E&O Insurers, "voluntarily provided its E&O [I]nsurers and their outside counsel with a copy of its mediation statement" and "regularly relayed real-time information concerning what happened in mediation sessions to its E&O [I]nsurers and their counsel." *Id.* at p. 2-3. Additionally, Plaintiffs allege that North River "shared the mediator's written proposal for settlement [with] at least one E&O [I]nsurer's outside counsel while that insurer was clearly still disputing coverage." *Id.* at p. 3.

As argued by Plaintiffs, "it is well-settled that when a client voluntarily discloses privileged communications to a third party, the privilege is waived." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991). North River, however, argues that none of the authority cited by Plaintiffs in support of their waiver argument "apply, interpret, or even mention the Pennsylvania [mediation] privilege statute . . . ." Dkt. No. 202 at p. 1.

While North River is correct that the authority cited by Plaintiffs considers waivers of privilege in circumstances not directly implicating Pennsylvania's mediation privilege, North River has failed to cite to any authority leading the Court to conclude that Pennsylvania's mediation privilege is absolute and wholly exempt from waiver by disclosure to a third-party. Indeed, it appears that the same general principles of waiver apply equally to Pennsylvania's

mediation privilege as to other areas of privilege. *See Stewart Title Guar. Co. v. Owlett & Lewis, P.C.*, 297 F.R.D. 232, 242 (M.D. Pa. 2013) (finding a waiver of privilege as to a mediation memo protected by Pennsylvania's mediation statute via inadvertent disclosure to adversary pursuant to Federal Rule of Evidence 502(b)). Thus, in the absence of any authority to the contrary, the Court finds that North River's disclosure of mediation documents to a third-party, such as its E&O Insurers, may operate as a waiver of the mediation privilege.

Beyond its apparent contention that Pennsylvania's mediation privilege is not subject to the same principles of waiver as other privileges, North River argues that the mediation privilege was not waived because "those E&O [I]nsurers with whom [North River] [was] having discussions during mediation *did* contribute to the final settlement to terminate [North River's] liability – unlike the current Plaintiffs who are refusing to contribute their shares." Dkt. No. 202 at p. 2 (emphasis in original). Thus, North River contends, because its E&O Insurers eventually did "contribute to the final settlement," its communications with its E&O Insurers during the same time period as the mediation(s) at issue are the "types of communications, as well as those with adversaries and potential adversaries," which "promote settlement and frank assessment" and therefore "have a nexus to the mediation." *Id.*

North River appears to argue that any communications with "adversaries and potential adversaries" who are not parties to the mediation at issue but may have some level of interest in a settlement reached as a result of that mediation have a "nexus to the mediation" and are therefore privileged.[24] *Id.* This far-reaching interpretation of Pennsylvania's mediation privilege is squarely at odds with the statute and the case law applying it, which clearly limits "mediation

---

[24] The Court notes that Pennsylvania's mediation privilege does extend to "communications 'by, between or among' representatives of insurance companies present at the mediation." *Dietz & Watson,* 2015 WL 356949 at *5 (citing 42 Pa.C.S.A. § 5949(c)). Here, however, there is no assertion or indication that North River's E&O Insurers were present at the relevant mediation(s).

communications" to those communications "made by, between or among a party, mediator, mediation program or any other person present to further the mediation process when the communication occurs during a mediation session or outside a session when made to or by the mediator or mediation program." 42 Pa.C.S.A. § 5949(c). There is no indication that North River's E&O Insurers were involved in the mediation, and thus, any communications between North River and its E&O Insurers related to the mediation are not protected from disclosure under Pennsylvania's mediation privilege.

Although North River's arguments refer specifically to mediation communications, Plaintiffs claim that North River, in addition to "regularly" providing its E&O Insurers with updates regarding the mediation, shared a copy of its mediation statement with its E&O Insurers. Dkt. No. 199-1 at p. 2. North River's mediation statement is unquestionably a mediation document which would be protected under Pennsylvania's mediation privilege. *See Dick Corp./Barton Malow*, 215 F.R.D. at 507 (at the "'core' of [mediation documents] are documents such as mediation position papers and specific information prepared for mediation sessions."). However, while North River's mediation statement would be protected by the mediation privilege as a mediation document, that privilege was waived when North River shared its mediation statement with its E&O Insurers, who were not involved in the mediations and appear to have been in an adversarial relationship with North River during the time the mediation statement was shared.

North River does not contend that the mediation documents shared with its E&O Insurers were subject to the common-interest exception but rather claims that mediation documents are entitled to a "separate type of protection from the traditional attorney-client and work product protections" under the mediation privilege. Dkt. No. 202 at p. 2. However, although North River does not argue that privileged mediation communications or documents shared with its E&O

insurers were subject to the common interest exception, which "can arise where separate clients retain different attorneys who then share information with each other pursuant to a common legal interest," in the interest of reaching a final resolution of this issue, the Court finds that based upon the information provided by the parties, the common interest exception would not apply to preserve the privilege in a mediation document or communication shared by North River with its E&O Insurers. *Mine Safety Appliances Co. v. N. River Ins. Co.*, 73 F. Supp. 3d 544, 573 (W.D. Pa. 2014) (citation omitted).

"Under the common interest doctrine, although an attorney actually represents only one party, there is no waiver of the attorney-client privilege by disclosure of privileged communications to third parties with[in] a 'community of interest.'" *Pittston Co.*, 143 F.R.D. at 69. "A community of interest exists where different persons or entities 'have an identical legal interest with respect to the subject matter of a communication between an attorney and client concerning legal advice . . . . The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial.'" *Id.* (citing *Duplan Corp. v. Deering Milliken Inc.,* 397 F.Supp. 1146, 1172 (S.D.S.C. 1974)), *see also In Re State Commission of Investigation Subpoena Number 5441,* 226 N.J.Super. 461, 466, 544 A.2d 893 (App. Div. 1988), *Weil Ceramics & Glass v. Work,* 110 F.R.D. 500, 502 (E.D.N.Y. 1986)).

In the context of insurance coverage actions, the common interest doctrine applies "when counsel has been retained or paid for by the insurer, and allows either party to obtain attorney-client communications related to the underlying facts giving rise to the claim, because the interests of the insured and insurer in defeating the third-party claim against the insured are so close that no reasonable expectations of confidentiality is said to exist." *See North River Ins. Co.*, 797 F. Supp. at 366 (citations omitted). The common interest doctrine is applicable "only when it has been

determined that the defendant insurer is obligated to defend the underlying action brought against the insured and only when the parties have *employed* a lawyer to act for them in common." *NL Indus.*, 144 F.R.D. 225 at 231 (citations omitted) (emphasis in original).

Specifically, the common interest exception requires the existence of "an actual triadic relationship between insured, attorney and insurer" and does not apply in situations where the insurer disputes coverage for the underlying claim. *Pittston Co.*, 143 F.R.D. at 71. This remains true even where an insurer eventually agrees to reimburse an insured for a "portion of its defense costs." *S'holder Representative Servs. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. CV 16-2886 (JMV), 2019 WL 4410039, at *3 (D.N.J. Sept. 16, 2019).

According to Plaintiffs, and undisputed by North River, during the pendency of the underlying lawsuits between North River and MSA, North River's E&O Insurers did not defend North River or "immediately agree to cover it" despite a demand by North River that its E&O Insurers "cover its bad faith exposure." Dkt. No. 199-1 at p. 2. Instead, Plaintiffs claim, North River's E&O Insurers "hired counsel and disputed coverage before North River settled with MSA" and one E&O Insurer "brought suit against North River contesting coverage." *Id.* Thus, because North River's E&O Insurers, at least initially, disputed coverage for the underlying claims, North River and its E&O Insurers did not share a common interest.

Accordingly, because North River's E&O Insurers were not directly involved in the mediation(s) and because the common interest exception does not apply to preserve the mediation privilege protecting any mediation documents shared by North River with its E&O Insurers, the Court finds that North River waived any mediation privilege protecting any mediation communications or documents it provided to its E&O Insurers.

In light of the foregoing, the Court orders as follows. First, North River shall identify any documents previously withheld as protected by Pennsylvania's mediation privilege which were previously produced to any third-party and shall, within fourteen (14) days, produce those documents to Plaintiffs.[25]  Secondly, as to any remaining documents withheld by North River based on an assertion of Pennsylvania's mediation privilege, within thirty (30) days, North River is to provide Plaintiffs, to the extent it has not already done so: (1) a detailed list of all mediations which took place between MSA and North River in connection with PA Federal Action and/or the PA State Court Action, which shall include the dates of any mediation sessions and the identities of the mediators; and (2) a detailed privilege log identifying whether any document withheld is a mediation communication or a mediation document, the identities of any individuals involved in any mediation communication and a description of the nature of the communication, the identity of the author and recipient of any communication documents and a description of the nature of the document, and, for each withheld document, the specific mediation session North River contends it bears a nexus to.[26] If disputes remain regarding North River's claim of privilege with respect to specific documents, the parties are to meet and confer, and if they are unable to reach a resolution, the parties may request that the Court conduct an *in camera* review of any disputed documents.

---

[25] To the extent that North River withholds any documents previously produced to a third-party based upon an assertion that North River and the receiving party shared a common interest at the time of production, North River shall include in its forthcoming privilege log the nature of the document, the date it was shared, the identity of the third party with whom it was shared and the status of North River's relationship with the third-party at the time it was shared.

[26] In reviewing documents responsive to Plaintiffs' discovery requests in this area and evaluating the applicability of the mediation privilege, North River is to be mindful that, as argued by Plaintiffs, "the mere fact that the parties engaged in settlement negotiations and *also* mediated at similar times does not automatically create a nexus covering all such negotiations." Dkt. No. 222 at p. 31. As such, the Court will not look favorably on any claims of mediation privilege not sufficiently tied to a specific mediation between North River and MSA.

IV.    **CONCLUSION AND ORDER**

The Court having considered the papers submitted pursuant to Fed. R. Civ. P. 78, and for the reasons set forth above;

**IT IS** on this 29th day of June, 2023,

**ORDERED** that Plaintiffs' motion to compel [Dkt. No. 190] is **GRANTED in part and DENIED in part without prejudice**; and it is further

**ORDERED** that Plaintiffs' motion to compel as to Category A is **DENIED without prejudice**; and it is further

**ORDERED** that Plaintiffs' motion to compel as to Category B is **DENIED without prejudice**; and it is further

**ORDERED** that Plaintiffs' motion to compel as to Category C is **GRANTED in part**; and it is further

**ORDERED** that this Opinion and Order shall remain under seal for fourteen (14) days during which time the parties may file a motion or motions to seal portions of this Opinion and Order pursuant to Local Civil Rule 5.3.

      s/ James B. Clark, III
      **JAMES B. CLARK, III**
      **United States Magistrate Judge**